J-A04012-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.K.K.-W., A MINOR   APPEAL OF R.G. AND E.G., KINSHIP PARENTS | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br>No. 1891 EDA 2019 |

Appeal from the Order Entered June 5, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000831-2016

BEFORE:   PANELLA, P.J., STRASSBURGER, J.*, and COLINS, J.*

MEMORANDUM BY PANELLA, P.J.:                **FILED APRIL 20, 2020**

In this appeal, we are faced with an unusual conflict. Two caring and competent families wish to adopt a dependent child currently in the custody of a child welfare agency. The trial court had the unenviable task of picking which of the two competing adoption petitions would be successful. After careful review, we can find no error or abuse of the trial court's discretion and therefore affirm.

_____

* Retired Senior Judge assigned to the Superior Court.

R.G. and E.G. ("Foster Parents"),[1] appeal from the order entered June 5, 2019, that denied their petition to adopt K.K.K.-W. (born in September 2012) ("Child"), and granted the petition to adopt Child filed by L.R. ("Aunt").

Much of the factual history of this matter was stipulated to by the parties. We will note where factual disputes exist.

In March 2014, Child was seen in the emergency room at St. Christopher's Hospital for Children ("St. Christopher's") because a chicken bone became lodged in his throat. *See* N.T., 3/28/18, at 10. Child was referred to the Hematology Department due to abnormal blood platelets. *See id.* However, Child's mother[2] failed to follow up with the scheduled appointment. *See id.* DHS received a General Protective Services report alleging medical neglect of Child and deplorable housing conditions. *See id.* As a result, Child and his three older siblings were informally placed with their maternal great aunt. *See id.*

In May 2014, Child was diagnosed with leukemia by St. Christopher's and was placed on a bone marrow donor waitlist. *See id.* Child was subsequently admitted to St. Christopher's for chemotherapy and radiation

_____

[1] We recognize that Foster Parents refer to themselves as Kinship Parents and that many witnesses, including the Philadelphia Department of Human Services ("DHS")'s witnesses, acknowledged that their prior relationship with Child renders them kinship foster parents. Our use of Foster Parents is solely for ease of discussion.

[2] Child's father died in July 2012.

treatments. *See id.* at 10-11. Child's mother visited sporadically and rarely called for updates. *See id.* at 11.

Child remained hospitalized at St. Christopher's until October 7, 2014. *See id.* At that time, he was transferred to Children's Hospital of Philadelphia ("CHOP") and remained there until February 9, 2015. *See id.* Child was placed in isolation due to his compromised immune system. *See id.*

Following an unsuccessful cord blood transplant in October 2014, Child underwent another cord blood transplant in December 2014 that was successful. *See id.* Child's mother appeared at the hospital on two occasions to sign consents for the cord blood transplants but rarely visited Child. *See id.* Due to mother's neglect, among other factors, the court terminated mother's parental rights to Child in April 2017.

Child was discharged from CHOP to Childway Pediatric Services ("Childway") on February 9, 2015. *See id.* at 12. Child was placed in an isolation room at Childway where he required around-the-clock monitoring for his health. *See id.* Child remained at Childway for ongoing treatment and supervision for 17 months. *See id.* Over the course of his stay, Child was admitted to CHOP on multiple occasions due to respiratory issues, episodes of high fevers, reactive airway disease, and auto-immune hemolytic anemia. *See id.*

Child was medically cleared to be discharged from Childway to a home environment on May 11, 2016, with the stipulation that the caretaker

successfully complete training for all necessary medical protocols.[3] ***See id.*** at 14. At Childway, R.G. ("Foster Mother") was assigned to Child as a one-on-one nursing assistant and cared for Child until his discharge to her medical foster home on June 16, 2016. ***See id.*** at 13.

The Northeast Treatment Center Community Umbrella Agency ("NET CUA") executive and case management team, the law department, and the child advocate all agreed to discharge Child to Foster Parents' home. ***See id.*** at 14. Child has resided with Foster Parents following his discharge to their care.

Aunt is the stepsister of Child's deceased father. ***See id.*** at 13. V.M. ("Grandmother") is married to Child's grandfather. ***See id.*** Both visited Child at Childway and attended medical appointments. ***See id.*** Beginning in October 2016, the juvenile court permitted Aunt two hours of weekly supervised visits with Child. ***See id.*** at 14-15. In March 2017, Child began four hour unsupervised visits with Aunt. ***See id.*** at 15. Visits expanded to eight hours in November 2017. ***See id.***

On July 14, 2017, Aunt filed a petition for adoption, followed by Foster Parents filing a petition for adoption on November 20, 2017. The trial court

---

[3] Foster Parents were certified as medical foster parents on June 14, 2016. ***See*** N.T., 3/28/18, at 14. Aunt was certified as a medical foster parent on August 23, 2016. ***See id.***

held hearings on the competing petitions.[4] At these hearings, the court heard the testimony of Aunt; Foster Mother; E.G. ("Foster Father"); Grandmother; James Loving, Psy. D., who the parties stipulated is an expert in clinical and forensic psychology and performed an assessment of Child's psychological functioning; Kala Fell, a Licensed Marriage and Family Therapist, who the parties stipulated is an expert in the areas of marriage and family therapy and trauma-focused therapy and acted as Child's trauma therapist; Ann Wohlschlaeger, CRNP, who provided care for Child at CHOP; Telita Thomas, an adoption case manager at NET CUA; Tasha Admiral, the initial NET CUA case manager; Kimberly Ali, Deputy Commissioner of Child Welfare Operations for DHS; and Kristin Neitz, a foster care worker for Bethany Christian Services ("Bethany").

At the conclusion of the final hearing on June 25, 2018, the trial court ordered all parties to file proposed findings of fact and conclusions of law within 45 days after receipt of the transcripts. At a status hearing on October 31, 2018, the parties reported that the transcripts of the hearings were not completed and that Aunt's counsel had died. **See** Continuance Order, 10/31/18. The court appointed counsel for Aunt and, after the transcripts of

---

[4] The transcript for the second half of the May 8, 2018 hearing is not contained in the certified record. However, the transcript is included in the reproduced record and we have considered it. **See Commonwealth v. Barnett**, 121 A.3d 534, 545 n.3 (Pa. Super. 2015) (stating, "While this Court generally may only consider facts that have been duly certified in the record, where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it." (citations omitted)).

testimony were completed, the parties filed proposed findings of fact and conclusions of law in February 2019.

On June 5, 2019, the court entered the order on appeal, denying Foster Parents' petition for adoption and granting Aunt's petition for adoption. Foster Parents timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5] Foster Parents raise the following issues for our review:

> 1. The [t]rial [c]ourt incorrectly asserts at page 38 of its opinion that Appellants "suggest that a subsequent hearing would make a nullity of the entire proceedings" and then the [t]rial [c]ourt concludes that "such a claim is without merit, lacks legal foundation and is merely supposition based on innuendo".
>
> 2. The [t]rial [c]ourt erred, abused its discretion, and violated the Due Process rights of Appellants *and the child* by permitting one (1) year to pass between the last day of trial and the decision by the [t]rial [c]ourt, thereby completely failing to consider, among other things, the enhancement of the bond and attachment between the child and the Appellants and siblings in the household and further in failing to consider the last year of the child's life in the [t]rial [c]ourt's mandatory needs and welfare determination.
>
> 3. The [t]rial [c]ourt erred as a matter of law and abused its discretion in failing to appoint legal counsel for the child within the meaning of the Adoption Act of Pennsylvania [(23 Pa.C.S.A. §§ 2101–2910)] and in failing to ascertain the wishes or preference of the child, and in so doing violated the constitutional right of the child to have legal counsel and therefore a voice with regard to his own life and adoption.

---

[5] On July 17, 2019, Foster Parents filed an "Emergency Motion To Stay Trial Court's May 30, 2019 Order And For Child To Remain In His Current Home With Kinship Parents Pending Resolution Of Appeal In Superior Court." By order dated July 18, 2019, this Court granted Foster Parents' motion and directed, "[t]he status of child's visitation order with [Aunt] is to remain in place, pending further order of this Court."

4. The [t]rial [c]ourt abused its discretion by disregarding, failing to give proper weight and / or deference to, and / or failing to attend to the full extent of the testimony of various witnesses, some of which was uncontradicted and undisputed, including Ann Wohlschlaeger (attending Children's Hospital nurse practitioner), Dr. Loving (the child transition evaluator), Kala Fell (attending trauma therapist of child), Appellee [Aunt], DHS Administrator, Kimberly Ali and the Appellants.

5. The [t]rial [c]ourt's failure to consider highly relevant evidence concerning what is in the child's best interests . . . is a gross error, an abuse of discretion[,] and a violation of its *parens patriae* duty.

6. The [t]rial [c]ourt erred as a matter of law and abused its discretion by not recognizing the Appellants as "kinship" as defined by Pennsylvania Law.

7. The [t]rial [c]ourt herein placed improper weight on Appellee's step-family relationship and failed to place great weight on the significant, highly valued, bonded, securely attached, existing family relationship the child has with . . . E.G., and R.G., Appellants[,] and O.G., their daughter.[6]

Foster Parents' Brief at 16, 18, 22, 31-32, 60, 74, and 78.[7]

With regard to adoptions, we review the trial court's determinations for an abuse of discretion. *See In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016). This Court has stated:

_____

[6] While Foster Parents' statement of questions involved contains six questions, their brief contains seven argument sections. This constitutes a violation of Pa.R.A.P. 2119(a), requiring the argument section to be "divided into as many parts as there are questions to be argued." Moreover, the argument section combines several of the questions involved and divides others. Despite the violation of Rule 2119(a), we address the issues posed by Foster Parents as set forth in the argument section of their brief.

[7] Child's Child Advocate has filed a brief supporting Foster Parents.

> An abuse of discretion does not exist merely because a reviewing court would have reached a different conclusion. Appellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will.

*Id.* While we are not bound by findings of fact unsupported by the record or the court's inferences drawn from the facts, we defer to the findings of the trial judge with regard to credibility and weight of the evidence. *In re Adoption of A.S.H.*, 674 A.2d 698, 700 (Pa. Super. 1996).

In Foster Parents' first two arguments, which we address together, Foster Parents fault the trial court for waiting one year after the close of testimony to deliver a decision. Foster Parents contend that this delay deprived the trial court of current evidence regarding Child's needs, welfare, and best interest, and his current relationship with Foster Parents and Aunt.[8] *See* Foster Parents' Brief at 17-18. Moreover, Foster Parents argue that the delay violated the due process rights of Foster Parents and Child. *Id.* at 19-21. Foster Parents contend that cases involving children are typically handled on an expedited basis, and that the delay here is "structurally an abuse of discretion[.]"[9] *Id.* at 21.

---

[8] While Foster Parents couch their first issue as a claim that the trial court erred by concluding that obtaining current evidence on Child's situation would render the prior proceedings a nullity, their argument essentially restates their assertion that the trial court should have obtained current information regarding Child. *See* Foster Parents' Brief at 17-18.

[9] The Child Advocate argues,

The trial court clarified its reasoning:

The trial court, counsel, and the parties were faced with a unique procedural history. Counsel for [Aunt] passed suddenly and unexpectedly after the trial but prior [to] submitting final required filings which were due from all counsel. Contrary to [Foster Parents'] suggestion that the trial court abused its discretion by violating Due Process, the trial court ensured the Due Process rights of all parties by appointing counsel in the stead of counsel who passed during his representation. Moreover, all counsel, at some point requested and/or agreed (without objection) to multiple continuance request[s]. Finally, as to the last contention espoused in [Foster Parents] initial averment, to suggest that a subsequent hearing would make a nullity of the entire proceedings. Such a claim is without merit, lacks legal foundation and is merely supposition based on innuendo.

Trial Court Opinion, 9/23/19, at 38.

It is well settled that "[p]rocedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." *Garr v. Peters*, 773 A.2d 183, 191 (Pa. Super. 2001) (internal quotation marks and citations omitted). "Due process is flexible and calls for such procedural

_____

In light of the fact that 17 months have passed since the trial concluded, [Child] is at a greater risk for psychological damage if he goes to live with Appellee. Therefore, this Court should remand to the trial court for a further evidentiary hearing regarding the best interests of [Child] at this point in time. *See In re Adoption of L.J.B.*, 18 A.3d 1098, 1110-1111 (remanding for an evidentiary hearing regarding change in circumstance of adoptive parent).

Child Advocate's Brief at 43.

- 9 -

protections as the situation demands." ***In re Adoption of Dale A., II***, 683

A.2d 297, 300 (Pa. Super. 1996) (citations omitted).

> Further,

> [i]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal[,] the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction . . . one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

***Thompson v. Thompson***, 963 A.2d 474, 475–476 (Pa. Super. 2008)

(citation omitted).

Here, no party objected to the timeliness of the trial court's decision or

contended that more current evidence was needed until the court entered its

order. Indeed, the record demonstrates that, by letter dated February 5,

2019, Foster Parents' former counsel sought a one-week extension for Foster

Parents and Aunt to file their proposed findings of fact and conclusions of law.

***See*** Letter, 2/5/19. The letter suggested that Aunt's counsel, the Child

Advocate, and counsel for DHS concurred in the request. The letter did not

seek to re-open the record to update the trial court on Child's status, and

there is no indication that any party objected to the time frames set by the

trial court until after the court entered its decision. The failure to timely object

or request that the record be re-opened results in waiver of these issues.

Nevertheless, had these issues not been waived, we would conclude that they lack merit. Although Foster Parents correctly observe that many cases involving children are handled on an expedited basis, Foster Parents do not identify specific time requirements applicable to adoptions. *See* 23 Pa.C.S.A. § 2901 ("the court may enter a decree of adoption at any time.").

Here, Foster Parents and Child were afforded due process, as the trial court held numerous hearings to allow all parties to present testimony and evidence. While there was a delay in obtaining the transcripts and the trial court issuing an order, that delay, given the number of hearings and the death of Aunt's counsel, is not unreasonable. Accordingly, to the extent these issues were not waived, we would conclude that the trial court did not abuse its discretion when it did not re-open the record to permit additional evidence.

Next, Foster Parents argue that the trial court erred because it failed to appoint legal counsel for Child and did not ascertain Child's preferred outcome. *See* Foster Parents' Brief at 22. Foster Parents argue that, in the context of involuntary termination of parental rights, children have a right to inform the court of their preferred outcome. *See id.* While Foster Parents concede that the appointment of legal counsel is not required in adoption proceedings, they argue that, given the magnitude of the decision, counsel should have been appointed for Child. *See id.* at 23.

Although the trial court appointed a Child Advocate for Child, Foster Parents argue that the Child Advocate's role was not defined, and "[a] child

needs the constitutional protection of having a voice in his choice of familial relationship." ***See id.*** at 24-25. Foster Parents argue that Child possessed a constitutional right to "have a say with regard to his permanent familial relationships. . . ."[10] ***See id.*** at 30-31.

The trial court addressed this issue as follows:

> Next, the trial court responds to the [Foster Parents'] second averment of error. Here, [Foster Parents'] reliance on the cited cases is misguided, as these cases address contested termination of parental rights cases. ***See In re Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017) (In that case, our Supreme Court held that failure to appoint counsel, separate from the guardian ad litem, for children **in a contested termination of parental rights case** is structural error. ***See id.*** at 183.) (emphasis added). Moreover, this issue was not raised during trial. "It is well-established that where the parties in a case fail to preserve an issue for appeal, an appellate court may not address that issue *sua sponte*." ***Johnson v. Lansdale Borough***, 146 A.3d 696, 709 (Pa. 2016) (citation omitted).

Trial Court Opinion, 9/23/19, at 38.

The appointment of counsel pursuant to the Adoption Act is governed by Section 2313(a), which states:

> (a) Child.--The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. **The court may**

---

[10] Foster Parents fault the trial court for appointing legal counsel for Aunt, while forcing Foster Parents "to fend for themselves with retained counsel." ***See*** Foster Parents' Brief at 23. However, Foster Parents did not raise this issue when the trial court appointed counsel for Aunt and do not develop this argument in any meaningful fashion in their brief. Accordingly, we conclude that this issue is waived. ***See In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (failure to develop argument and cite to authority to support argument results in waiver of claim); ***Thompson v. Thompson***, 963 A.2d at 475–76 (Pa. Super. 2008).

> **appoint counsel** or a guardian ad litem **to represent any child** who has not reached the age of 18 years and is **subject to any other proceeding under this part whenever it is in the best interests of the child**. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a) (emphasis supplied).

Our Supreme Court, in *In re Adoption of L.B.M.*, 161 A.3d 172, 183 (Pa. 2017) (three justice plurality joined by two justices concurring), held that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in contested involuntary termination proceedings. The Court noted that legal interests are synonymous with the child's preferred outcome, but the child's best interests are determined by the court. *Id.* The Pennsylvania Supreme Court has held that: (1) a guardian *ad litem* may serve as counsel where there is no conflict between the child's legal and best interests, and (2) there is no conflict between the child's best and legal interests if the child is non-communicative due to the child's young age. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018).

Pursuant to Section 2313(a), the court "shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents." *See* 23 Pa.C.S.A. § 2313(a). In other circumstances, "[t]he court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child." *See id.* As our Supreme

Court has explained, "[t]he statutory word 'may' as contrasted with 'shall' signals a discretionary rather than a mandatory act." ***Commonwealth v. Williams***, 828 A.2d 981, 988 (Pa. 2003).

Pursuant to the plain language of the statute, the trial court was permitted, but not required, to appoint a guardian *ad litem* or legal counsel for Child. In fact, Child was represented by a Child Advocate throughout the proceedings, who represented to the trial court, "I feel as if this is a dual role, what [Child] wishes as well as what we believe is in his best interest." ***See*** N.T., 3/28/18, at 25.

Accordingly, while there is no requirement for the trial court to appoint counsel for Child, the trial court did so, and counsel indicated they represented both Child's best and legal interests. Further, the Child Advocate argued in favor of Foster Parents' adopting Child. Thus, even if Child possessed a constitutional right to counsel, the appointment of a single guardian *ad litem* ("GAL")/legal counsel to represent Child was appropriate. ***See In re T.S.***, 192 A.3d at 1092-93. Foster Parents' third issue does not merit relief.[11]

_____

[11] We also reject Foster Parents' argument that the court did not discern Child's preferred outcome. The legislature requires the consent to an adoption of the adoptee, "if over 12 years of age." ***See*** 23 Pa.C.S.A. § 2711. Child was five at the time of the hearing, and, therefore, there is no requirement that Child consent to the adoption. Moreover, the Child Advocate, who asserted that she represented "what [Child] wishes," argued in favor of Foster Parents adopting Child.

Next, we address Foster Parents' remaining issues, wherein Foster Parents contend that the trial court did not properly assess the best interests of Child. In adoption matters, the paramount concern is the best interests of the child. *In re K.D.*, 144 A.3d at 151. "This 'best interests' determination is made on a case-by-case basis, and requires the weighing of all factors which bear upon a child's physical, intellectual, moral, and spiritual well-being." *In re A.S.H.*, 674 A.2d at 700 (Pa. Super. 1996); *see also* 23 Pa.C.S.A. § 2902(a). Once parental rights have been terminated:

> anyone may become an adoptive parent, and the best interest of the child is the controlling factor by which a court must be guided. Furthermore, a trial court must base its conclusions in an adoption case upon all relevant information discerned with the full participation of all interested parties.

*In re Adoption of D.M.H.*, 682 A.2d 315, 319 (Pa. Super. 1996).[12]

"[W]hen possible, the preservation of the family is the desired outcome in custody matters. However, [t]he goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors." *In re K.D.*, 144 A.3d at 153 (internal quotation marks omitted). Additionally, the trial

---

[12] Typically, a foster parent must obtain the consent of the child service agency that maintains custody; however, the agency's decision to withhold consent is not dispositive. *In re Adoption of J.E.F.*, 902 A.2d 402, 418 (Pa. 2006) ("hold[ing] that the custodial agency's refusal to consent to [foster parents'] petition to adopt does not, by itself, operate to deprive [them] of standing to participate").

court has the duty to consider the statements and opinions of the GAL when making its determination of which family would better serve the bests interests of the child.[13] **See Adoption of D.M.H.**, 682 A.2d at 322. Further, "[t]he existence of an emotional bond between the child and one of the prospective custodial parents is an important factor." **In re A.S.H.**, 674 A.2d at 700.

Significantly, when parental rights have been terminated "the familial relationship, the blood connection, no longer has the significance that it would have otherwise." **Adoption of D.M.H.**, 682 A.2d at 319. When considering the impact of familial relationships, "a live-in relationship with a direct sibling is far more powerful than occasional or even regular visits with cousins or other similarly distant family members." **Id.** At 320.

Nevertheless, a petitioner's genetic relationship with the child is a relevant consideration that the trial court must address in deciding to grant or deny a petition for adoption. **See id.** at 319 ("the trial court properly

---

[13] The trial court did not directly acknowledge the Child Advocate's position that Child should be adopted by Foster Parents in its opinion. However, at the conclusion of the hearings, the Child Advocate made a closing statement informing the trial court that the Child Advocate supported Child's adoption by Foster Parents. **See** N.T., 6/25/18, at 53-61. Further, the trial court stated, "I take this matter very seriously. I promise all parties that I will review everything. My personal notes, the notes of testimony, everything that the attorneys provided to this [c]ourt." **See id.** at 62. Thereafter, all parties, including the Child Advocate, submitted extensive findings of fact and conclusions of law. We have no reason to question that the trial court did what it promised to do, and considered the Child Advocate's position.

evaluated the familial relationship between grandmother and child by making the relationship a relevant, but not a controlling, consideration.").

In Foster Parents' fourth and fifth issues, they argue that the trial court improperly considered and weighed the evidence, and, as a result, entered an order that is not in Child's best interest. Foster Parents fault the trial court's analysis of the testimony of Ann Wohlschlaeger, Dr. Loving, Kala Fell, Kimberly Ali, Telita Thomas, Foster Parents, and Aunt. *See* Foster Parent's Brief at 31-60.

In essence, Foster Parents argue that the trial court took testimony that was negative for Foster Parents out of context and afforded it too much weight, and, similarly, gave testimony that was positive for Aunt too much weight. *See id.* Further, Foster Parents argue that the trial court ignored testimony that was favorable to them. *See id.* Additionally, Foster Parents assert that the trial court treated their testimony less favorably than Aunt's. *See id.* at 54.[14]

In their fifth issue, Foster Parents argue that the trial court failed to consider all relevant evidence to assess the best interests of Child. *See id.* at 60-61. Foster Parents contend that the trial court did not consider the bond between themselves and Child, and observe that virtually no testimony was

_____

[14] The Child Advocate argues that the trial court failed to appropriately consider the "required best interest of the child analysis, instead focusing exclusively on Appellee's biological ties with the child as well as the perceived missteps by municipal agencies. . . ." Child Advocate's Brief at 3.

elicited regarding the bond between Child and Aunt. *See id.* at 62. Further, Foster Parents assert that the trial court failed to consider the Child Advocate's recommendation in favor of Child's adoption by Foster Parents. *See id.* at 63. Foster Parents also argue that the trial court ignored: Child's medical issues; Aunt's historical lack of involvement and failure to address Child's neglect; Foster Parents' relationship with Child during his time at Childway; the close bond between Child and his foster family; Foster Parents' financial stability and Aunt's financial instability; and Aunt's limited ability to understand and address Child's medical issues. *See id.* at 61-69. Foster Parents note that the trial court incorrectly concluded that Aunt was medically certified as a foster parent when Child was released from Childway; unfairly questioned Foster Mother's truthfulness; concluded there were concerns about Child's safety in Foster Parents' home; and ignored Aunt's initial lack of involvement. *See id.* at 69-74.

Last, in their sixth and seventh issues, Foster Parents fault the trial court for failing to acknowledge they are a kinship placement due to the relationship that developed between Child and Foster Parents while Child was at Childway.[15] *See id.* at 74-75. Foster Parents contend that the trial court

---

[15] Pursuant to statute, "[i]f a child has been removed from the child's home under a voluntary placement agreement or is in the legal custody of the county agency, the county agency shall give first consideration to placement with relatives or kin." *See* 67 Pa.C.S.A. § 3105. Kin includes "[a]n individual with

should have placed Foster Parents and Aunt on an equal footing as each are kinship placements. *See id.* at 75. Foster Parents conclude that the trial court improperly placed Aunt's familial connection above the evidence that Child has a close and bonded relationship with the foster family.[16] *See id.* at 78-79.

In its opinion, the trial court issued extensive findings of fact. The trial court noted that DHS supported Aunt's adoption petition, but observed, "the child's best interest is the only relevant factor in determining whether to grant or deny an adoption petition." Trial Court Opinion, 9/23/19, at 21-22. The trial court recounted the extensive history of Child's medical care and Aunt's efforts to be approved as a foster parent for Child. *See id.* at 23-27. The court recognized that Child was released from Childway to Foster Parents, and expressed concern Aunt was not included in the decision to discharge Child.

---

a significant, positive relationship with the child or family." *See* 67 Pa.C.S.A. § 3102.

[16] The Child Advocate echoes Foster Parents' arguments regarding Child's best interests, asserting that the trial court ignored Child's close relationship with his foster family and improperly focused on Aunt's complaints regarding the handling of Child's case; Foster Mother's anxiety; and concerns about Child's behavior. Child Advocate's Brief at 30-31, 33-35. Further, the Child Advocate faults the trial court for discussing the failure of the Child Advocate to request Child's placement with his paternal grandmother. *See id.* at 36. Additionally, the Child Advocate argues that the trial court took testimony out of context to support its finding of a safety concern in Foster Parents' home. *See id.* at 37-38. The Child Advocate contends the trial court did not consider Child's bond with Foster Parents and granted Aunt's petition for adoption solely based on biological ties and not on an evaluation of Child's best interests. *See id.* at 39-41.

*See id.* at 26-27. Further, the court credited testimony that Aunt did not have visitation with Child from June 16, 2016 through September 29, 2016, before the juvenile court ordered two hour supervised visits in late September 2016. *See id.* at 28.

The court also credited testimony that Thomas, a NET CUA adoption case manager, visited Child in Foster Parents' home in October 2016 and observed that Child appeared to be "a happy, energetic little boy that was running around and playing." *See id.* However, Thomas observed rough playing between Child and O.G., Foster Parents' daughter. *See id.* The court noted that, at a subsequent visit in November 2016, Thomas was concerned that Child and O.G. ignored Foster Mother when she told them to stop running and to sit down. *See id.* at 28-29. Thomas observed another incident in late 2016 or early 2017 where O.G. tried to kick Child down the stairs, although Foster Mother prevented her from doing so. *See id.* at 29.

The court noted that, shortly after the parental rights to Child were terminated, Foster Mother began to complain about Child's behavior. *See id.* However, the trial court observed that Thomas did not notice tantrums or difficult behavior during her visits. *See id.* In November 2017, Child told Foster Mother that he wanted to live with Aunt. *See id.* at 30. In December 2017, Foster Mother reported to Thomas that Child was having a tantrum. *See id.* When Thomas arrived minutes later, Child was lying on a bench reading and did not appear to be having a tantrum. *See id.* However, Foster

Mother was "very frantic, very upset, visually shaken, in tears and complaining about [Child's] tantrums getting out of control." *Id.*

Foster Mother also reported that she was having a hard time dealing with Child's outbursts. *See id.* The court observed that, based on the visit, Thomas concluded that Foster Mother was emotionally unstable and recommended that Foster Mother contact her foster care agency, Bethany, for support. *See id.* Thomas learned that Bethany had similar concerns and had discussed putting a safety plan in place at the home. *See id.*

The court also noted that Bethany put two safety plans in place in December 2017 and January 2018, with the January 2018 safety plan containing more detail. *See id.* The safety plans were designed to provide Foster Parents additional assistance and to ensure Child's safety. *See id.* The safety plans remained in place at the time of the hearings. *See id.* at 31. Further, the court noted that Foster Mother acknowledged a history of anxiety predating Child being placed in her home, and faulted Foster Mother for not disclosing the issue to Child's therapist. *See id.*

The court also considered the testimony of Dr. Loving, who concluded that Child is emotionally and medically resilient. *See id.* at 32. The court credited testimony that Child has a "fairly good" prognosis for moving from one home to another because he has a level of familiarity and comfort with Aunt. *See id.* The court also credited Dr. Loving's opinion that there are benefits for children to be with their biological family, including a sense of

- 21 -

identity, and an easier and more comfortable understanding of who they are, where they come from, and where they belong. *See id.*

The court noted Thomas's testimony that Aunt facilitates visits between Child and his siblings. *See id.* at 33. Child talks about his siblings to Thomas constantly and expresses that he misses them and wants to know when he will see them. *See id.* Prior to Aunt arranging the visits, they occurred infrequently. *See id.*

The court observed that Thomas recommended that Child be placed with Aunt "because she believes that children who are placed with their biological family have a stronger connection to their family throughout their lifetime that makes it easier for the child's adjustment." *Id.* at 21. The court discounted Aunt's past financial challenges, concluding that Aunt was currently financially stable. *See id.* at 33.

The court also recounted testimony from Fell, Child's trauma therapist, that Child shares a healthy attachment with Aunt that is similar to his attachment with Foster Mother.[17] *See id.* at 35. The court concluded, "[b]ased upon the foregoing facts and applicable statutory and case law, this court finds that it would be in [Child's] best interest to be adopted by [Aunt]." *Id.*

---

[17] The trial court's opinion suggests that this testimony is found at N.T., 5/1/18, at 147: 11-19. Pursuant to our review, we note the testimony actually occurred at page 171.

- 22 -

Upon a careful review of the record, we conclude that, while the record supports Foster Parents' contention that there is a bond between Foster Parents and Child, the trial court did not abuse its discretion by granting Aunt's petition for adoption. Foster Parents testified that they love Child and have a close bond to him. **See** N.T., 5/8/18, at 8; N.T., 6/25/18, at 5, 12. Further, they provided testimony about the close and loving relationship between Child and O.G., their natural daughter. **See** N.T., 5/8/18, at 41-42; N.T., 6/25/18, at 29-30.

Foster Parents took Child on vacations with them and never put him in respite care. **See** N.T., 6/25/18, at 33. Further, Foster Mother missed her grandfather's funeral to ensure Child could have surgery the same day, refusing to reschedule the surgery because "it wasn't in [Child's] best interest." N.T., 5/8/18, at 61-63. Additionally, because of Child's medical needs, Foster Mother decreased her work schedule to part-time and made changes to the home to account for Child's asthma.[18] **See id.** at 89-90.

_____

[18] Ann Wohlschlaeger, Child's nurse at CHOP, testified that Child's medical appointments are now more sporadic. **See** N.T., 3/29/18, at 159. Further, she testified that she had no concerns about Foster Mother's medical care of Child and noted that she has a loving relationship with Child. **See id.** at 168-69. Wohlschlaeger noted that Aunt asks relevant questions at appointments and had no concerns about Aunt's ability to understand Child's medical needs. **See id.** at 169-70. However, Aunt would still need to receive a one-hour medical training. **See id.** at 170.

Foster Mother testified that she spent time with Child at Childway as his nurse technician and brought her family to see Child. *See id.* at 19-20, 39. During Child's time at Childway, the foster family took Child on approximately 25 outings. *See id.* at 47.

In April of 2015, Foster Mother learned that Child needed a resource he could be placed with. *See id.* at 45-46. Foster Mother contacted the Child Advocate and Tasha Admiral. *See id.* at 47. Subsequently, Foster Parents completed training. *See id.* at 46-47. When Child was initially placed with Foster Parents, he had difficulty adapting and would cry, scratch, tantrum, and wake up with night terrors. *See id.* at 36. Foster Mother also explained that Child would throw himself on the ground and hit himself and walls. *See id.* at 38.

In December 2017, Child's behavior escalated to the point he attempted to push O.G. down the stairs and threatened to kill Foster Mother. *See id.* at 73. Child also expressed a desire to live with Aunt. *See id.* at 77. Child's behavior regressed to the point that Foster Mother wrote to the Child Advocate, "I need help or I'm not sure that I can keep doing this." *Id.* However, Foster Mother testified that Child's behaviors calmed down after Child began trauma therapy in January 2018. *See id.* at 86.

With respect to Child's relationship with Aunt, Foster Mother testified that Child does not talk about Aunt without prompting and occasionally asks

not to visit Aunt. *See id.* at 9, 12. However, Foster Mother acknowledged that Child looks forward to seeing his siblings. *See id.* at 11.

Foster Mother testified that Child's behaviors escalate after visits with Aunt. *See id.* at 65-66. Despite Child's negative reaction to visits, Foster Mother agreed that it is important for Child to see his biological family and conceded that Child would have a negative response if he no longer saw Aunt. *See id.* at 113-14. Foster Mother testified that she would allow ongoing contact with Aunt and Child's family if she were allowed to adopt Child. *See id.* at 64.

Aunt testified regarding her background and relationship with Child. Aunt is a certified nurse assistant and works on the weekends but would alter her schedule if she were permitted to adopt Child.[19] *See* N.T., 3/28/18, at 29-31. When Child was admitted to St. Christopher's and CHOP, Aunt acknowledged she did not visit him, claiming that there were restrictions on who could visit. *See id.* at 35-36, 65-67.

After Child was released to Childway, Aunt visited once a week for two hours, although her visits became more sporadic when her father was ill. *See*

---

[19] Counsel for Foster Parents cross-examined Aunt extensively on inconsistencies regarding Aunt's financial statements, the source of a home equity loan taken out to effectuate the repairs to her property, overdue taxes, and code violations. *See* N.T., 3/28/18, at 116-24, 137-40, 149-50.

*id.* at 36-37, 69-70, 73-75. Thereafter, Aunt visited one or more times a week beginning in August 2015. *See id.* at 74-75.

Aunt made various repairs to her home in the hope that Child would be discharged to her care and underwent training through NET CUA and Childway. *See id.* at 38-40. In June 2016, Aunt learned that Child was being released to Foster Parents because she did not complete all of her medical training to care for Child. *See id.* at 42-46.

After Child was released to Foster Parents' care, Aunt continued to have visits with Child, with the visits eventually expanding to eight unsupervised hours in November 2017. *See id.* at 46-49, 77-78. Aunt began to have visits every other Saturday when Child sees his six siblings.[20] *See id.* at 49, 51, 55-56. Aunt testified that Child's visits with his siblings go well and that they love each other. *See id.* at 91-92.

Aunt testified that Child has a good relationship with her youngest child. *See id.* at 62-63. They play games together and are "like two peas in a pod." *Id.* at 63. Aunt acknowledged that Child refers to her as Aunt S. and to her mother as "grandmom." *Id.* at 76. Aunt also conceded that Child is very close with the foster family and has a strong attachment to them. *See* N.T., 3/29/18, at 49, 52.

---

[20] Several of Child's siblings are in foster care. *See* N.T., 3/28/18, at 89-90.

Aunt testified Child has a parent-child relationship with Foster Parents and a sibling relationship with O.G. *See id.* at 53-54. However, Aunt explained that she wants to adopt Child because she loves him and she wants him home with his family. *See* N.T., 3/28/18, at 64-65.

Tasha Admiral, the NET CUA case manager from April 2014 through September 2016 provided a historical view of Child's case. *See* N.T., 5/8/18, Vol. II, at 3. Admiral testified to concerns about Aunt because Aunt did not visit Child while he was at St. Christopher's and CHOP. *See id.* At 10-11.

Initially, Admiral identified Grandmother as a placement resource, but she was precluded from caring for Child because her husband had a conviction involving an assault on a child. *See id.* at 13-15. Thereafter, Admiral identified Aunt as a possible resource. *See id.* at 15. Aunt was open to participating in a home assessment and caring for Child. *See id.* at 16. However, when Admiral performed the home assessment, she determined Aunt's home was not appropriate as Aunt was doing repairs to the carpet and the kitchen and there was no bed for Child. *See id.* at 21.

Admiral testified that, although Child could have been released from CHOP to a home, she could not locate an appropriate home. *See id.* at 23-24. Accordingly, Child was placed at Childway. *See id.* at 23-24. After Child was moved to Childway, Admiral continued to have concerns that Aunt was not proactive about obtaining a foster care certification and did not consistently attend visits or medical appointments. *See id.* at 32-34, 36-39.

Admiral explained she had to "practically beg for them to step it up[,] you know[,] because he needed to be in a preadoptive home, he need[ed] to be adopted and he needed to be loved and cared for." *Id.* at 39.

When Admiral asked Aunt whether she would adopt Child, Aunt did not want to commit and suggested she would take Child until his mother got back on her feet. *See id.* at 110-12. After the juvenile court allowed Admiral to investigate placing Child with Foster Parents in October 2015 Aunt's participation changed and she began visiting weekly. *See id.* at 40-42.

While Child was at Childway, Foster Parents took him on numerous outings and developed a good relationship with Child. *See id.* at 43-46. Admiral noted that Child began referring to Foster Mother as "mom", although Foster Mother attempted to redirect him. *Id.* at 45-46. In contrast to the attention to Child that Foster Parents demonstrated, Admiral testified that Aunt visited sporadically, only took Child on one outing to get pizza, and was not knowledgeable regarding Child's health and needs. *See id.* at 46-50.

When Child was discharged from Childway, Admiral determined Child should be placed with Foster Parents because of their commitment to Child and their bond with Child. *See id.* at 50, 56-57. Admiral concluded that Aunt was not an appropriate placement because of her level of commitment, family support, and bond with Child. *See id.* at 50-53.

Admiral testified that individuals at DHS and NET CUA then tried to convince her to change her position. *See id.* at 65-66. Admiral believed they

supported Aunt because she was part of Child's family. *See id.* at 69. Admiral was instructed to reassess Aunt's home in September 2016, and found the house to be structurally appropriate; however, Admiral did not believe Aunt could handle Child's medical conditions. *See id.* at 79-81. Further, Admiral testified that when she monitored supervised visits with Aunt, Child appeared to be uncomfortable. *See id.* at 87-88. When Admiral left her job in September 2016, Child and the foster family had a genuine and loving relationship. *See id.* at 90-91.

Admiral's replacement, Telita Thomas, an adoption case manager for NET CUA, became Child's case manager in October 2016. *See* N.T., 4/18/18, at 6-7. Thomas acknowledged that Child's case was considered a high-profile case at NET CUA because of the involvement of "higher ups" at DHS, and the NET CUA administration and executives became involved. *See id.* at 53-54.

Thomas testified that Aunt was upset about Child being discharged to Foster Parents and attempted to put pressure on DHS through her state representative and the Philadelphia mayor's office.[21] *See* N.T., 4/19/18, at

---

[21] Kimberly Ali, the Deputy Commissioner of Child Welfare Operations for DHS, testified that she became involved after Aunt made complaints about Child being discharged to Foster Parents rather than Aunt. Ali recommended that Aunt be permitted to adopt Child because she is a committed family member and demonstrated an ability to care for Child. *See* N.T., 4/19/18, at 76. Ali testified that Child is resilient and "[i]t's comforting for children to know who they are, where they come from, where their family comes from. That's comforting for them. That they have siblings, that they have a relationship

9-11. When Thomas first received the case, her superiors wanted Child moved to Aunt's home; however, Thomas claimed that she reviewed all of the available information before deciding it was best to move Child to Aunt's home.[22]  *See* N.T., 4/18/18, at 56-58; N.T., 4/19/18, at 11-13.

Thomas testified that she went to Foster Parents' home in October 2016, and Child appeared happy, energetic, and was running around.  *See* N.T., 4/18/18, at 13-15.  She observed that Foster Parents share a close bond with Child, show love to Child, and created an appropriate structure in the home. *See id.* at 87.

She believed that Foster Parents and Child both love each other and have a parent-child relationship.  *See id.* at 84-88.  Thomas also observed a sibling bond between Child and O.G.  *See id.*  Thomas testified that Child responds well to Foster Father and dresses like him.  *See* N.T., 4/19/18, at 33-34.  Thomas further testified that Child calls Foster Parents "mom and dad" and refers to Aunt as "Aunt S."  N.T., 4/18/18, at 84-85.

Thomas opined that Child would be negatively affected if removed from Foster Parents' home.  *See id.* at 88-89.  Further, Thomas acknowledged that

---

with their siblings.  It's comforting for them to know their grandparents, their great grandparents, their aunts and uncles."  *See id.* at 76-77.

[22] DHS filed a motion to move Child to Aunt's home in September 2016 but the juvenile court did not permit DHS to move Child.  *See* N.T., 4/19/18, at 70-71.

Child has difficulty transitioning and engaged in self-harming behavior when transitioned from CHOP to Childway.  *See* N.T., 4/19/18, at 25-27.

However, Thomas expressed concerns about the interactions between Child and O.G. at her first visit, as they played very roughly, with O.G. putting Child in a headlock that Child struggled to get out of.  *See* N.T., 4/18/18, at 15.  At a visit in November 2016, Child and O.G. were running around and did not respond to Foster Mother.  *See id.* at 17.  Thomas noted that the home had less structure than she was used to seeing.  *See id.*  On another occasion, O.G. moved her foot as if she was going to kick Child down the steps.  *See id.* at 18.

Thomas also testified that Foster Mother complained about Child's behavior at home, but Thomas never observed any issues.  *See id.* at 19-20. In late November or early December 2017, Foster Mother sent an email regarding Child's "multiple tantrums, very aggressive behavior, kicking walls, yelling and screaming he hated her, he was going to harm [O.G.].  He was threatening to kick her down the steps."  *Id.* at 23-24.

On Thomas' way to a visit in December 2017, Foster Mother texted Thomas to indicate that Child was having a tantrum.  *See id.* at 25.  When Thomas arrived several minutes later, Child was lying on a bench reading. *See id.*  Foster Mother "was very frantic, very upset, visually shaken.  She was in tears and stated that, you know, [Child's] tantrums were getting out of control.  She's having a hard time dealing with them.  The things that he

- 31 -

says are very harsh. He says, I hate you, you're not my mom, you don't love me." *Id.* at 26.

Thomas suggested that Foster Mother reach out to her foster care agency, Bethany, for additional training to better deal with Child's tantrums. *See id.* Thomas learned that Bethany had similar concerns and had already discussed putting a safety plan into action in the home.[23] *See id.* at 29. The safety plan was to ensure that Foster Mother received additional assistance. *See id.* at 29-30. However, Thomas testified that Foster Parents are good caretakers of Child and stated, "[a]bsolutely he's safe in the home." *Id.* at 86.

Turning to Aunt's relationship with Child, Thomas testified that she only missed one or two visits between October 2016 and April 2018. *See id.* at 31. Thomas observed no issues with Aunt's behavior at visits. *See id.* Further, although Thomas expressed some concern about unpaid taxes, she

---

[23] Kristin Neitz, the Bethany social care worker, testified that Foster Mother reached out to Neitz with concerns about Child threatening to push O.G. down the stairs. *See* N.T., 5/1/18, 37. Neitz implemented a safety plan in December 2017 because she believed that something was happening in the home that compromised Child's safety and considered it necessary to keep Child on a safety plan. *See id.* at 37-38, 40, 89. Out of the thirty families Neitz worked with, Foster Parents were the only ones with a safety plan. *See id.* at 87-89. Nevertheless, Neitz did not believe Child should be removed from Foster Parents' care and thought such a move would negatively impact him. *See id.* at 48-50.

was generally not concerned about Aunt's finances. *See id.* at 45-46, 64, 67-69.

When Thomas visited Aunt's home in October 2016, it appeared orderly and neat. *See id.* at 34. Thomas had no concerns about Aunt's qualifications to care for Child. *See id.* at 345.

Thomas testified regarding a visit in November 2016, recalling that Child went into Aunt's house and seemed to know his routine. *See id.* at 38. Child took his jacket off and put it away before taking Thomas on a tour of the home. *See id.* Thomas observed "a really good relationship" between Child and Aunt and noted that Child talks about Aunt's children frequently. *Id.* at 38-40. Thomas also observed that Child talked about his siblings constantly and asked when he would see them. *See id.* at 41. Thomas believed that it would be traumatic for Child if he did not see Aunt, Grandmother, or his siblings again. *See* N.T., 4/19/18, at 43-44.

Based on her observations, Thomas believed that both homes were equally appropriate, but recommended that Child be adopted by Aunt because "children who are placed with their biological family have a stronger connection to their family throughout their life[t]ime." N.T., 4/18/18, at 42-43; N.T., 4/19/18, at 51. Thomas believed there would be a benefit to a lifetime connection to his siblings because they had similar experiences and they have a close bond. *See* N.T., 4/18/18, at 44-45. Further, she believed the siblings would stay in contact if Aunt is permitted to adopt Child. *See id.*

at 45. However, Thomas did not believe either Foster Parents or Aunt would initiate contact with each other regardless of who was allowed to adopt Child. *See* N.T., 4/19/18, at 38.

Kala Fell, Child's trauma counselor, testified regarding Child's mental health treatment after he was referred to her in December 2017. *See* N.T., 5/1/18, at 116-18. Fell noted that Child experienced multiple traumatic events, including his time in medical isolation without access to his primary caregiver. *See id.* at 122.

When treatment began, Foster Mother reported that Child was having nightmares and difficulty sleeping at night, and was harming himself. *See id.* Fell diagnosed Child with Post-Traumatic Stress Disorder. *See id.* at 125. As therapy progressed, Child seemed more confident and his behavioral symptoms subsided. *See id.* at 130-31.

Fell testified that Child did not have an awareness that he was in foster care, describing Foster Parents as his parents. *See id.* at 128-29. Later, Child suggested that Aunt was his foster family. *See id.* at 129. Fell testified that Child refers to Foster Parents as "mommy" and "daddy" and believed he "experiences them as his parents." *Id.* at 132. Further, Child relates to O.G. as his sister and they have "a really adorable relationship." *Id.* at 137. Fell had no concerns about Foster Mother caring for Child long term. *See id.* at 134.

Over the course of therapy, Child began speaking more about "his positive visits at [Aunt's] home and spending time with his siblings when visiting with her. And so he also shares that he has a positive relationship with her." *Id.* at 133. Fell also participated in caregiver sessions with Aunt, testifying that Aunt loves Child and "that she's just a really loving lady." *Id.* at 138.

However, Fell did not believe Aunt fully understood Child's trauma symptoms because she had not experienced the behavior during her time with Child. *See id.* at 140. Nevertheless, she believed that Aunt had the capacity and willingness to learn how to meet Child's needs. *See id.* Overall, she believed that Child had a healthy attachment to Foster Parents and Aunt. *See id.* at 167-68, 171.

Fell opined that, if the court terminated the relationship with Foster Mother, Child "would be very confused by that and I think that he would be terribly stressed." *See id.* at 141. Fell based this opinion on Child viewing Foster Parents as his parents and believed Child would "grieve that loss." *See id.* at 142-44. Fell expected that Child would exhibit physical aggression, angry outbursts, threats of self-harm, potential harm to others, nightmares, and sleep disturbances. *See id.* at 142.

However, Fell testified that Child would suffer a similar impact if his relationship with Aunt were severed, but not "to the same extent," because Child is cared for day-to-day by Foster Parents. *See id.* at 144-45. Fell

testified that Child is resilient, but credited that to Child's "safe recovery environment." **See id.** at 148. Although Fell expected Child to regress in the immediate future if removed from Foster Parents' home, she believed the transition to Aunt's home would be aided by the fact that they had a preexisting relationship. **See id.** at 149-50, 159-60.

Dr. Loving testified regarding his psychological evaluation of Child. **See** N.T., 3/29/18, at 78-79. He noted that he was not retained to make a permanency recommendation, but considered the options and set forth his prognosis for Child. **See id.** Dr. Loving opined that Child had "a fairly good long-term prognosis for long-term emotional health regardless of custodial outcome." **Id.** at 82-83. Dr. Loving noted that Child is resilient and doing well despite his trauma history. **See id.** Further, Child "progressed and thrived while he's been in [Foster Parents'] home for a long period of time." **Id.** at 84. Accordingly, Dr. Loving believed that Foster Parents contributed to his resilience. **See id.** at 101-02.

Dr. Loving opined that Child "has a fairly good prognosis in the long term for moving from one home to another in part because there is a basic level of familiarity and comfort." **See id.** at 86. However, he would expect Child to have a significant setback in the near term. **See id.** at 127.

Assuming a basic level of health and stability, Dr. Loving testified that there are benefits for children to be with biological family, including a sense of identity, understanding who they are, where they come from, and where

they belong. *See id.* at 93. Dr. Loving observed, "[t]his becomes important as they get a bit older, like adolescence, where any child, no matter what the issues are, start to question those sorts of things." *Id.* at 93-94. He further explained, "all things being equal, it is a healthier experience typically for a kid to be in a biological family where those issues are less complicated." *Id.* at 94. However, he also testified, "all other things being equal, it would certainly be better if [Child] were to stay where he is and not have to experience that disruption, that change of home situation." *Id.* at 108.

Foster Parents argue that the trial court focused solely on Aunt's familial relationship with Child. This Court has reversed an order granting an adoption petition when the order was only based on the petitioner's status as the child's grandmother. *See In re K.D.*, 144 A.3d 145 (Pa. Super. 2016) (reversing trial court order granting grandmother's petition for adoption based solely on blood relationship despite testimony that the child had a close relationship with the foster parents, grandmother behaved inappropriately at supervised visits, the child reacted negatively to visits with grandmother, and grandmother could not care for the child's medical needs). Here, the situation is markedly different, and the trial court appropriately considered Aunt's relationship with Child, her devotion to Child, Child's relationship to his siblings and extended family, and Aunt's suitability to care for Child.

Foster Parents focus on the selfless care they provided Child for years and the bond that exists between Child and his foster family, and their position

as "kin." However, multiple witnesses testified to the beneficial relationship between Child and Aunt and that children who are placed with relatives do better in the long term. Further, although Child will experience loss if he does not see Foster Parents, witnesses also testified that Child would experience loss if he does not see Aunt. While the trial court did not focus extensively on Child's relationship with the foster family, it did acknowledge that he appeared happy in their home, and shares a similar attachment to Foster Mother and Aunt, demonstrating that it considered Child's attachment to the foster family. *See* Trial Court Opinion, 9/23/19, at 28, 35.

Although some of the trial court's language is less than precise, it is apparent that the court focused on determining the best interest of Child in a case that represented a close call. Based upon our review of the record, and in light of our deferential standard of review, we discern no abuse of discretion in the trial court's conclusion that allowing Aunt to adopt Child is in his best interest and affirm the trial court order. *See In re R.J.T.*, 9 A.3d 1179 at 1190 (Pa. 2010) (instructing that this Court should defer to the trial court where a "close call" was made). Additionally, we lift the stay entered on July 18, 2019.

Order affirmed. Stay lifted. Jurisdiction relinquished.

Judge Colins joins the memorandum.

Judge Strassburger files a concurring memorandum in which Judge Colins joins.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/20/20